El Juez Asociado Señor Rebollo López
emitió la opinión del Tribunal.
El 4 de diciembre de 2003 Ebel International Limited presentó, ante la División de Marcas de Fábrica del Depar-tamento de Estado, una solicitud para el registro de la marca “Ebel Paris & Diseño” en la clase internacional nú-mero 3. Ebel International, compañía dedicada a la pro-ducción de maquillaje, preparaciones cosméticas, perfume-ría, productos para el cuidado personal, corporal y facial, está incorporada en Bermuda, es subsidiaria y la tenedora de las marcas del grupo corporativo Belcorp. A su vez, Bel-corp es la corporación internacional encargada de la orien-tación estratégica, lanzamiento, publicidad y acceso a nue-vos mercados de dichos productos, con sede en Lima, Perú. El Departamento de Estado aprobó, preliminarmente, la solicitud de registro de la marca y el edicto correspondiente *621 fue publicado el 27 de diciembre de 2003 en un periódico de circulación general en Puerto Rico.
La Federation des Industries de la Perfumerie (FIP)(1) presentó una oposición a la solicitud de registro de la marca Ebel Paris, bajo el fundamento que ésta era geográ-ficamente descriptiva, constituía una designación de ori-gen falsa y, por ende, era engañosa. A tales efectos, señaló que Ebel International es una corporación registrada en Bermuda y no en París. A su juicio, la alusión a París en el nombre pretendía vincular engañosamente el producto con la ciudad de París porque ésta es un lugar reconocido mun-dialmente por la calidad de los perfumes y productos de belleza producidos allí.
Ebel International formuló su contestación, arguyendo que Ebel Paris no es ni un nombre ni un término geográ-fico indicativo de la procedencia de los productos. No obs-tante lo anterior, sostuvo que tampoco constituía una de-signación de origen engañosa debido a que una subsidiaria de Belcorp, conocida como Ebel Internacional France, está localizada en París, Francia, y contrata allí todo lo relativo a la elaboración, fabricación y suministro de los productos que llevan la marca Ebel Paris; por lo cual, el componente geográfico de la marca coincide con el lugar de procedencia de los productos y no existe una posibilidad de engaño al consumidor.
Por su parte, la FIP indicó que las oficinas centrales de Ebel International no están ubicadas en París ni sus pro-ductos son manufacturados en dicha ciudad. Además, se-ñaló que la ubicación de las oficinas de una subsidiaria era irrelevante al evaluar el origen geográfico de un producto, ya que lo determinante era el domicilio del solicitante y no el lugar de donde proceden los productos, y en este caso, Ebel International estaba sita en Bermuda.
*622 Nuevamente, Ebel International reiteró que sus produc-tos eran manufacturados en Francia y que, por lo tanto, la marca no era engañosa. La vista en su fondo fue celebrada el 29 de marzo de 2005. El único testigo fue Angel Acevedo Villalba, gerente corporativo de marcas y proyectos inter-nacionales de Belcorp.
El 6 de junio de 2005 la FIP presentó un escrito urgente informándole al Departamento de Estado que la Oficina de Patentes y Marcas de Estados Unidos (U.S. Patent and Trademark Office o P.T.O.) había denegado la solicitud de registro de la marca Ebel Paris presentada por Ebel International. Ésta, a su vez, replicó y expuso que la ale-gada denegatoria no era una determinación final sino pre-liminar, y que su solicitud podría ser aprobada una vez se subsanara cualquier deficiencia identificada por dicha oficina.
El 7 de noviembre de 2005 el oficial examinador rindió su informe. Determinó que, en vista de que los productos de la marca Ebel Paris no provenían de París, la marca era engañosa en cuanto al origen de los productos. En conse-cuencia, recomendó se declarara “con lugar” la oposición presentada por la FIP y se denegara la solicitud de registro de la marca Ebel Paris. El Departamento de Estado, me-diante Resolución de 15 de noviembre de 2005, acogió la recomendación del oficial examinador y rechazó la solicitud para el registro de la marca Ebel Paris.
Denegada su moción de reconsideración, e inconforme con la denegatoria de su solicitud de marca, Ebel International recurrió ante el Tribunal de Apelaciones para solici-tar la revocación de la resolución emitida por el Departa-mento de Estado. Adujo que dicho foro erró al concluir que el significado primario de la marca Ebel Paris, la cual se trataba de una marca compuesta, era el de una localiza-ción geográfica generalmente conocida. Además, planteó que el foro recurrido incidió al no conceder el peso necesa-rio al hecho de que los productos marca Ebel Paris tienen contactos suficientes con la ciudad de París.
*623 El Tribunal de Apelaciones confirmó la resolución recurrida. Concluyó que la marca Ebel Paris era una marca compuesta y geográficamente engañosa. Tomando en cuenta que Ebel International es una compañía sita en Bermuda y es una subsidiaria de Belcorp, ubicada en Perú, el tribunal concluyó que no tenía contactos suficientes con París. Igualmente, indicó que la existencia de una compa-ñía subsidiaria en Francia no demostraba los contactos ne-cesarios para justificar el uso del término Paris en la marca, razón por la cual determinó que la marca Ebel Paris resultaba engañosa y podía generar confusión en la mente de los consumidores en torno al origen de los productos.
De tal decisión, Ebel Internacional recurrió ante este Tribunal —vía certiorari— para alegar que el Tribunal de Apelaciones incidió al concluir que
... el significado de Ebel Paris es París y por ende la marca es geográficamente engañosa[;]
... por ser Ebel France una subsidiaria de Belcorp [corporación sita en Perú], y por no ser manufacturados en la ciudad de París, los productos marca Ebel Paris no no tienen contactos suficientes la ciudad de París. Petición de certiorari, pág. 4.
Expedimos el recurso. Con el beneficio de la compare-cencia de la partes, procedemos a resolver.
I
 A. La Ley de Marcas del Estado Libre Asociado de Puerto Rico, Ley Núm. 63 de 14 de agosto de 1991 (10 L.P.R.A. see. 171 et seq.) (Ley de Marcas), define una marca como “todo signo o medio que sirva para distinguir en el mercado productos o servicios de una persona, de produc-tos o servicios de otra persona”. 10 L.P.R.A. sec. 171(a). Una marca de fábrica persigue distinguir los productos del solicitante de otros productos en el mercado. Para cumplir dicho propósito, es necesario que la marca *624 sea característica de los productos y los identifique como únicos en el mercado.
En conformidad con las disposiciones de la Ley de Marcas, el derecho sobre una marca se adquiere por el registro válido de ésta en el Departamento de Estado. Arts. 3 y 4 de la Ley de Marcas, 10 L.P.R.A. secs. 171a y 171b. Sin embargo, en Arribas v. American Home, 165 D.P.R. 598, 605 (2005), al interpretar el Art. 3(b) de la Ley de Marcas, aclaramos que las marcas también se pueden adquirir por su uso. Como resultado de ello, el registro de una marca “sucumbirá ante la reclamación oportuna de quien tiene mejor derecho sobre la marca por haberla usado con anterioridad”, aun cuando éste no la haya registrado. Igual norma ha sido establecida a nivel federal. Véanse, entre otros: Allard Enterprises v. Advanced Programming, 249 F.3d 564 (6to Cir. 2001); Veryfine Products, Inc. v. Colón Brothers, Inc., 240 799 F. Supp. 240 (D. P.R. 1992).
Anteriormente, hemos señalado que existen diversos tipos de marcas que, dependiendo si son distintivas o no, son susceptibles de ser registradas. En Posadas de P.R. v. Sands Hotel, 131 D.P.R. 21 (1992), distinguimos cuatro categorías de marcas, comenzando desde las inherentemente distintivas —y, por lo tanto, siempre registrables— hasta las que de ordinario no son registrables como marcas por no ser distintivas, a saber: (1) las arbitrarias o imaginables, (2) las sugestivas, (3) las descriptivas y (4) las genéricas.
Las marcas arbitrarias o imaginables no guardan rela-ción alguna con el producto que identifican. Por un lado, las marcas imaginables emplean palabras inventadas por el comerciante que no existen en nuestro lenguaje porque carecen de definición en los diccionarios, tal como lo serían las marcas Xerox y Kodak. Por otra parte, las marcas arbi-trarias consisten de palabras comunes u ordinarias utiliza-das para representar ciertos productos, aun cuando no existe relación alguna entre el producto y el nombre de la *625 marca, tal como el uso de Dove (ave) o Ivory (color) en re-ferencia a los jabones. La marca arbitraria no describe cua-lidades del producto. Posadas de P.R. v. Sands Hotel, ante.
Por otro lado, las marcas sugestivas requieren el uso de la imaginación de parte del consumidor en torno a una característica del producto. En Posadas de P.R. v. Sands Hotel, ante, ejemplificamos lo anterior aludiendo al uso de la marca “Caesars Palace” para un hotel, con el propósito de señalar la opulencia del nombre.
Distinto a las categorías de marcas antes descritas, las cuales tras ser registradas pueden ser utilizadas de forma exclusiva por el que las reclamó, las marcas descriptivas sólo pueden ser utilizadas con exclusividad cuando han ad-quirido un significado secundario en el mercado. En Posadas de P.R. v. Sands Hotel, ante, pág. 34, indicamos que “ [s] e obtiene el significado secundario cuando el consumi-dor asocia la marca con los bienes de un producto en particular”. (Énfasis suprimido.)
Por último, las marcas genéricas aluden al género o clase dentro del cual el producto particular es un espécimen. Éstas no son susceptibles de ser utilizadas por una persona de forma exclusiva cuando se usan para iden-tificar un producto de dicho género; ni siquiera son regis-trables si adquieren un significado secundario. Incluso, una marca que inicialmente fue arbitraria o imaginable se puede convertir en genérica a través de su uso gener-alizado. Así, cuando la mayoría de los consumidores le otorgan un significado primario a dicha marca con relación al producto que representa, se convierte en un término ge-nérico y no puede ser usado por una persona de forma exclusiva. Ejemplos de ello son los términos aspirina, “export soda” y thermos. Posadas de P.R. v. Sands Hotel, ante.(2)
*626 B. La Ley de Marcas se deriva del Lanham Act, 15 U.S.C.A. sec. 1051 et seq., estatuto que regula el derecho de marcas en el ámbito federal. Aun cuando dicha legislación coexiste con las leyes estatales sobre marcas, de surgir un conflicto entre las disposiciones estatales y las federales, el Lanham Act ocupa parcialmente el campo del derecho de marcas y la disposición estatal conflictiva carece de validez. Arribas v. American Home, ante.
Por dicha razón, en ocasiones previas hemos destacado que la jurisprudencia interpretativa del Lanham Act tiene gran valor persuasivo al interpretar las disposiciones de nuestra Ley de Marcas. Posadas de P.R. v. Sands Hotel, ante.
Originalmente, la See. 2 del Lanham Act, 15 U.S.C.A. see. 1052, disponía:
No trademark by which the goods of the applicant may be distinguished from the goods of others shall be refused registration on the principal register on account of its nature unless it —
(a) Consists of or comprises immoral, deceptive, or scandalous matter ....
(e) Consists of a mark which ... (2) when used on or in connection with the goods of the applicant is primarily geographically descriptive ... [or] deceptively misdescriptive of them. ...
(f) Except as expressly excluded in [paragraphs (a)-(d) ] of this section, nothing in this chapter shall prevent the registration of a mark used by the applicant which has; become distinctive of the applicant’s goods in commerce. ... (Enfasis suplido.)
A través del North American Fair Trade Agreement (NAFTA), Dec. 17, 1992, 32 I.L.M. 605 (1993), se introdu-jeron enmiendas al Lanham Act que alteraron las Secs. 2(e) y 2(f) antes citadas, en torno a los criterios aplicables al atender solicitudes para el registro de las marcas deno-minadas “primarily geographically descriptive” —princi-palmente geográficamente descriptivas— y las “primarily *627 geographically deceptively misdescriptive”.(3) Sobre el particular, la Corte de Apelaciones para el Circuito Federal(4) destacó: “[t]his treaty shifts the emphasis for geographically descriptive marks to prevention of any public deception.” In re California Innovations, Inc., 329 F.3d 1334, 1339 (Fed. Cir. 2003). McCarthy define una “marca geográficamente descriptiva” como “any noun or adjective that designates geographical location and would tend to be regarded as buyers as descriptive of the geographic location of origin of the goods or services”. 2 McCarthy on Trademarks and Unfair Competition, 4th Ed., Sec.l4:2.
Por su parte, las marcas denominadas “primarily geographically deceptively misdescriptive” son aquellas cuyo significado primario es una localización geográfica común-mente conocida, lo cual induce a los consumidores a creer, erradamente, que dicha localización es el lugar de origen de los productos, y tal designación de origen falsa es un elemento material para los consumidores al decidir si ad-quieren los productos. Véase In re California Innovations, Inc., ante.
Previo al NAFTA, la solicitud de inscripción de las mar-cas principalmente geográficamente descriptivas y de las “primarily geographically deceptively misdescriptive” al amparo de la Sec. 2(e)(2) del Lanham Act, 15 U.S.C.A. sec. 1052(e)(2), eran denegadas preliminarmente y ubicadas en un registro suplementario (Supplemental Register), hasta tanto el solicitante demostrara que, en el mercado, la marca propuesta se había tornado distintiva (“distinctive”) de sus productos al amparo de la Sec. 2(f), 15 U.S.C.A. sec. *628 1052(f), y el público así lo reconocía. Por lo cual, el Lanham Act proveía el mismo tratamiento para ambos tipos de marcas. Para lograr acceso al registro, lo esencial era de-mostrar un “acquired distinctiveness” —que adquirió un carácter distintivo— o “secondary meaning” —significado secundario— al amparo de la Sec. 2(f).
Por el contrario, toda solicitud de inscripción de una marca engañosa o “deceptive” era denegada de plano por ser inherentemente fraudulenta al amparo de la Sec. 2(a). Las marcas “geographically deceptive” —geográficamente engañosas— eran denegadas al amparo de tal disposición. No existía la posibilidad de registrar una marca geográfi-camente engañosa mediante la demostración de un “secondary meaning”. Por lo cual, el registro de marcas geográfi-camente engañosas estaba terminantemente prohibido al amparo de dicha sección.
En vista de que tal denegatoria era final, era más difícil para el P.T.O. demostrar que una marca era geográfica-mente engañosa al amparo de la Sec. 2(a) del Lanham Act, 15 U.S.C.A. sec. 1052(a). Ese tipo de caso exigía un quantum mayor de prueba que la que se requería para determi-nar que una marca era principalmente geográficamente descriptiva o “primarily geographically deceptively misdes-criptive” al amparo de la extinta Sec. 2(e)(2). In re California Innovations, Inc., ante.
No obstante las enmiendas sufridas por el NAFTA, la Sec. 2(a) del Lanham Act, ante, que proscribe la inscripción de marcas geográficamente engañosas y engañosas per se, permaneció inalterada. Ello reafirmó el interés de evitar el engaño o fraude al consumidor en la inscripción de marcas. Así, en la actualidad, una marca engañosa nunca puede ser registrada. In re California Innovations, Inc., ante.
Ahora bien, la Sec. 2(e)(2) del Lanham Act, ante, fue alterada sustancialmente y actualmente dispone:
*629 No trademark by which the goods of the applicant may be distinguished from the goods of others shall be refused registration on the principal register on account of its nature unless it —
(e) Consists of a mark which (1) when used on or in connection with the goods of the applicant is merely descriptive or deceptively misdescriptive of them, (2) when used on or in connection with the goods of the applicant is primarily geographically descriptive of them, except as indications of regional origin may be registrable under section 4 [15 U.S.C.A. sec. 1054] of this title, (3) when used on or in connection with the goods of the applicant is primarily geographically deceptively misdes-criptive of them ....
(f) Except as expressly excluded in subsections (a), (b), (c), (d), (e)(3), and (e)(5) of this section, nothing in this chapter shall prevent the registration of a mark used by the applicant which has become distinctive of the applicant’s goods in commerce. The Director may accept as prima facie evidence that the mark has become distinctive, as used on or in connection with the applicant’s goods in commerce, proof of substantially exclusive and continuous use thereof as a mark by the applicant in commerce for the five years before the date on which the claim of distinctiveness is made. Nothing in this section shall prevent the registration of a mark which, when used on or in connection with the goods of the applicant, is primarily geographically deceptively misdescriptive of them, and which became distinctive of the applicant’s goods in commerce before December 8, 1993 [the date of the enactment of the North American Free Trade Agreement Implementation Act]. A mark which would be likely to cause dilution by blurring or dilution by tarnishment under section 43(c) [15 U.S.C.A. sec. 1125(c)] of this title, may be refused registration only pursuant to a proceeding brought under section 13 [15 U.S.C.A. sec. 1063] of this title. A registration for a mark which would be likely to cause dilution by blurring or dilution by tarnishment under section 43(c) [15 U.S.C.A. sec. 1125(c)] of this title, may be canceled pursuant to a proceeding brought under either section 14 or section 24 [15 U.S.C.A. sec. 1064 or 1092] of this title. (Énfasis suplido.)
Como puede observarse, la antigua Sec. 2(e)(2) fue divi-dida en dos incisos. El nuevo inciso 2(e)(2) regula la ins-cripción de las marcas denominadas principalmente geo-gráficamente descriptivas o “primarily geographically *630 descriptive”. Éstas son registrables en el registro principal si el solicitante demuestra que la marca ha adquirido un significado secundario al amparo de la Sec. 2(f), ante. En la alternativa, el solicitante puede solicitar el registro preli-minar de la marca en el registro suplementario hasta tanto demuestre que ésta ha adquirido un significado secundario.
Aunque no existe consenso en torno a los elementos por considerarse al determinar si una marca ha adquirido un significado secundario, es bien sabido que se configura cuando el público no asocia el producto con el lugar particular de origen sino exclusivamente con la marca, el manufacturero del producto y la calidad de sus productos. Sobre el particular, McCarthy entiende que “[t]he doctrine of secondary meaning requires that a geographically descriptive term, like any other descriptive symbol, be associated with a particular source in buyers’ minds before any trademark significance, may be attached to the term”. McCarthy Secs.14:7,14:9 y 15:11; Leelanau Wine Cellars v. Black & Red, Inc., 2007 Fed. App. 0384P (6to Cir. 2007); Daesang Corp. v. Rhee Bros., Inc., 77 U.S.P.Q.2d (BNA) 1753 (D. MD. 2005); Star Industries v. Bacardi & Company Ltd., 412 F.3d 373 (2do Cir. 2005); Commerce Nat. Ins. v. Commerce Ins. Agency, 214 F.3d 432 (3er Cir. 2000); Forschner Group, Inc. v. Arrow Trading Co. Inc., 30 F.3d 348 (2do Cir. 1994). (5)
Así, una marca geográficamente descriptiva adquiere un significado secundario cuando, a través de su uso en el *631 comercio, se le asocia exclusivamente con unos productos particulares y la fuente de éstos, mas no una localización geográfica particular. Commerce Nat. Ins. v. Commerce Ins. Agency, ante.
Distinto a las marcas geográficamente descriptivas, la Sec. 2(f) ahora prohíbe el registro, tanto en el registro pre-liminar como en el principal, de las marcas “primarily geographically deceptively misdescriptive” al amparo del in-ciso (e)(3). Ya no cabe la posibilidad de demostrar que ésta ha adquirido un significado secundario que justifique su registro.
En resumidas cuentas, para efectos de la inscripción de una marca, el NAFTA eliminó la distinción entre las marcas clasificadas como geográficamente engañosas o “geographically deceptive” al amparo de la Sec. 2(a) y las “primarily geographically deceptively misdrescriptive” al amparo de la Sec. 2(e)(3), en tanto extendió la prohibición del registro preliminar a esta última. Consecuentemente, en la actualidad, las marcas “primarily geographically deceptively misdrescriptive” ya no son susceptibles de tornarse distintivas (“distinctive”) o adquirir un significado secundario, según lo permitía la antigua Sec. 2(f) y, por lo tanto, no son inscribibles de forma preliminar ni permanente. McCarthy Secs. 14:31, 14:37.
Ante la eliminación de la posibilidad de inscribir una marca “primarily geographically deceptively misdrescripti-ve” de forma preliminar, ahora el NAFTA exige un están-dar legal más estricto para la evaluación de ese tipo de solicitud de registro, para así asegurar la protección de los intereses del solicitante y a la vez evitar el engaño de los consumidores. In re California Innovations, Inc., ante.
Adviértase que para denegar la inscripción de una marca, en cualesquiera de los supuestos ante su consideración, le corresponde al P.T.O. demostrar que ésta no es registrable, ya sea porque (1) es geográficamente descriptiva (“primarily geographically descriptive”) y no posee un sig- *632 niñeado secundario, (2) es “primarily geographically deceptively misdescriptive” o (3) engañosa per se (“deceptive”). Del mismo modo, le corresponde evaluar si procede su re-gistro preliminar cuando ello fuere posible al amparo de la Sec. 2(f). McCarthy Sec. 14:26.
C. En aras de conciliar los cambios introducidos por el NAFTA, la Corte de Apelaciones para el Circuito Federal creó e implantó un examen (“three-prong test”) para deter-minar cuando procede denegar el registro de una marca que sea “primarily geographically deceptively misdrescrip-tive” al amparo de la Sec. 2(e)(3), 15 U.S.C.A. see. 1052(e)(3).
En esencia, el P.T.O. debe denegar la inscripción al amparo de dicho fundamento cuando: (1) el significado primario de la marca es una localización geográfica comúnmente conocida; (2) el público consumidor cree que dicha localización es el lugar de origen de los productos o bienes en cuestión cuando en realidad éstos no provienen de éste, y (3) tal creencia errada es un factor esencial o material para el consumidor al decidir si adquiere el producto o bien. In re California Innovations, Inc., ante.
La asociación o conexión creada en la mente de los consumidores, entre la marca y la localización geográfica, ha sido denominada el “goods/place association”. El P.T.O. no puede denegar la inscripción de una marca sin antes demostrar que en efecto existe un “goods/place association”, y éste es un elemento material en la decisión del consumidor de adquirir el producto. Véanse: Daesang Corp. v. Rhee Bros., Inc., ante; In re Les Halles de Paris J.V., 334 F.3d 1371 (Fed. Cir. 2003); In re California Innovations, Inc., ante; In re Wada, 194 F.3d 1297 (Fed. Cir. 1999); McCarthy Sec. 14:33. Para ello, es suficiente con demostrar que los consumidores identifican la localización geográfica como el lugar de origen de los productos. In re Les Halles de Paris J.V., ante.
*633 Una vez el P.T.O. concluye que existe un “goods/place association”, debe determinar si dicha asociación resulta engañosa. Sólo denegará la inscripción de una marca cuando el “goods/place association” es un factor material para el consumidor al decidir si adquiere el producto y lleva a éste a adquirirlo por la creencia falsa de que pro-viene de una localización geográfica particular, señalada en la marca, cuando ese no es su origen verdadero. Véase McCarthy Sec. 14:33. Adviértase que el enfoque principal del NAFTA y el Lanham Act es evitar el uso de marcas engañosas o fraudulentas. In re California Innovations, Inc., ante.
Recalcamos que si los productos provienen de la locali-zación geográfica, aun cuando exista un “goods/place association”, no existe probabilidad de engaño al consumidor.
II
Resulta primordial en la consideración del presente caso destacar que la distinción lingüística entre las marcas geo-gráficamente engañosas, las marcas geográficamente des-criptivas y las marcas “primarily geographically deceptively misdescriptive” no es mero capricho, sino que delimita dis-tinciones inequívocas trazadas en la ley y la juris-prudencia. Ello como consecuencia de los requisitos y efectos diversos de cada clasificación. Recuérdese que se prohíbe tajantemente el registro de las marcas geográficamente en-gañosas al amparo de la Sec. 2(a) y la de las marcas “primarily geographically deceptively misdescriptive” al amparo de la Sec. 2(e)(3), mientras las marcas geográficamente des-criptivas al amparo de la Sec. 2(e)(2) pueden ser registradas si se demuestra que han adquirido un significado secunda-rio o preliminarmente hasta tanto se demuestre un signifi-cado secundario. Como consecuencia de ello, no son térmi-nos intercambiables entre sí. Tomando en cuenta lo anterior, es preciso enfatizar que las partes no han delimitado tales *634 diferencias claramente y, al argumentar sus respectivas po-siciones, encontramos incompatibilidades en torno al funda-mento de derecho en que basan sus alegaciones. Del mismo modo, los foros recurridos han confundido el derecho aplica-ble a la controversia ante nos. Veamos.
En su petición de certiorari, Ebel International sostiene que Ebel Paris es una marca compuesta cuyo significado principal es Ebel y no Paris. Como consecuencia de ello, alega que la alusión a la ciudad de París no es un elemento dominante ni el que le distingue de otros productos simila-res en el mercado. Así, pues, concluye que Ebel Paris no es una marca geográficamente engañosa. En apoyo a su argu-mento, indica que el logo lleva la palabra Paris debajo de la palabra Ebel y en un tamaño mucho más pequeño, eviden-ciando que la alusión a dicha ciudad es un elemento de segundo plano. Además, resalta que existen otras marcas que incluyen Paris en su nombre, por lo cual lo que las distingue entre sí no es la alusión a París, sino la fama y calidad del producto en particular, ya sea Ebel, L’Oréal o cualquier otro.
Por otro lado, Ebel International alega que Ebel France, sita en la ciudad de París, recibe las órdenes de compra de parte de Belcorp y controla la calidad y manufactura de los productos Ebel Paris. Además, Ebel France obtiene los con-tactos y contrata a los proveedores, los maquiladores(6) y ensambladores que manufacturan los productos. Por lo cual, a su juicio, existen contactos suficientes con la ciudad de París. También indica que la mayoría de los perfumes producidos en Francia no se manufacturan en París, sino en centros de producción ubicados alrededor de dicha ciu- *635 dad, y aun así, el término Paris ha sido utilizado en las marcas que representan tales productos.
En oposición a todo lo anterior, la FIP reitera que la marca Ebel Paris es geográficamente engañosa porque los productos no provienen de dicha ciudad. En apoyo a tal contención, alude a la Sec. 2(e)(3) del Lanham Act sobre las marcas “primarily geographically deceptively misdescriptive”. También utiliza los mismos criterios a los cuales aludió el Departamento de Estado para con-cluir que el significado primario de la marca Ebel Paris es geográfico y que, por lo tanto, es una marca engañosa. Por otra parte, enfatiza que la sede corporativa de Ebel International es Belcorp, corporación peruana, por lo cual, la marca Ebel Paris proviene de dicho país. Sobre el particular, indica que el registro de la referida marca ha sido denegado en diversos países latinoamericanos por tal mo-tivo, y que igual curso debe seguirse en Puerto Rico.
Del expediente ante nuestra consideración surge que, al evaluar si la marca Ebel Paris es engañosa, el oficial exa-minador utilizó los criterios siguientes: (1) si el significado primario de la marca es una localización geográfica gene-ralmente conocida; (2) si los bienes para los cuales Ebel International solicita el registro se originan en el lugar identificado en la marca; (3) si los compradores, con toda probabilidad, creerían que los bienes de servicio se origi-nan en el lugar geográfico que se menciona en la marca, y (4) si la representación engañosa fue un factor material en la decisión de los compradores de adquirir los productos en cuestión.
En torno al primer elemento, el oficial examinador des-tacó que no existe controversia en torno a que París es una localización geográfica conocida. Además, indicó que la in-clusión de la palabra Ebel no suprime ni minimiza la pre-sencia de la palabra Paris. Tampoco subsana el posible en-gaño generado por el uso de la palabra Paris, en tanto los *636 consumidores pueden adquirir el producto bajo la creencia de que los productos provienen de dicha ciudad.
En cuanto al segundo criterio, el oficial examinador de-terminó que, según la prueba testifical y documental some-tidas ante su consideración, resulta claro que los productos que elabora y compra Ebel International se producen en diversas regiones de Francia, mas no en la ciudad de París.
Finalmente, en torno al tercer y cuarto criterio seña-lado, el oficial examinador concluyó que ante el renombre de París como el centro mundial de perfumes y productos cosméticos, cualquier alusión a dicha ciudad en una marca puede llevar al consumidor a creer que el producto pro-viene de allí y es de calidad superior. En vista de que los productos de Ebel Paris no provienen de tal ciudad, la in-clusión de la palabra París en la marca la torna engañosa.
Bajo fundamentos similares, el Tribunal de Apelaciones confirmó la resolución del Departamento de Estado que de-claró “con lugar” la oposición al registro presentada por la FIP. Determinó que la marca Ebel Paris era “primordial-mente geográficamente descriptiva de manera engañosa” al amparo de la Sec. 2(e)(3)- del Lanham Act y que, por lo tanto, no era registrable. Señaló que los productos de Ebel Paris no provienen de la ciudad de París, ciudad recono-cida mundialmente por la producción de productos de be-lleza de alta calidad. Además, sostuvo que Ebel International tampoco llevaba a cabo algún tipo de investigación, desarrollo, producción, ensamblaje, envasaje y embalaje de sus productos en París. Incluso, señaló que todo lo relativo a la publicidad de los productos se realizaba desde las ofi-cinas de Belcorp en Perú. Así, la inclusión de la palabra Paris, con el propósito de evocar la ilusión de belleza y estilo parisino, ciertamente induciría a los consumidores a adquirir los productos bajo la creencia falsa de que eran producidos en dicha ciudad. Por último, el Tribunal de Ape-laciones indicó que Ebel Paris era una marca compuesta, integrada de una palabra imaginaria (Ebel) y un término geográfico (París) cuyo significado primario era geográfico.
*637 III
Nos corresponde evaluar, en primer término, el método utilizado por el oficial examinador al emitir su determina-ción final. De las conclusiones de derecho formuladas por el oficial examinador podemos inferir que éste aplicó única-mente, y de forma modificada, el examen establecido en In re California Innovations, Inc., ante, para determinar si una marca es “primarily geographically deceptively mis-descriptive” al amparo de la Sec. 2(e)(3) del Lanham Act, ante. También aludió a los incisos (1), (4) y (7) del Art. 5(a) de la Ley de Marcas, 10 L.P.R.A. sec. 171c.
Es preciso señalar, además, que tanto la FIP en su ale-gato en oposición como el oficial examinador en su reco-mendación, erraron al aludir al inciso (7) del Art. 5 de la Ley de Marcas, ante, el cual se refiere a la prohibición de registrar cualquier
...marca que sea idéntica a otra marca ya inscrita o conocida que pertenezca a otro y que se use en productos o servicios de las mismas propiedades descriptivas o que tanto se asemeje a la marca perteneciente a otro, que sea muy probable que oca-sione confusión o equivocación en la mente del público o de lugar a engaño de los compradores. (Énfasis suplido.) 10 L.P.R.A. sec. 171c(7).
En el ámbito federal, ello se conoce como el “likelihood of confusion” discutido en la Sec. 2(d) del Lanham Act, 15 U.S.C.A. sec. 1052(d). Ésta prohíbe el registro de una marca “which so resembles a mark registered in the Patent and Trademark Office, or a mark or trade name previously used in the United States by another and not abandoned, as to be likely, when used on or in connection with the goods of the applicant, to cause confusion, or to cause mistake, or to deceive”.
Sin embargo, en la resolución del Departamento de Es-tado no se señala que esté registrada o en proceso de regis- *638 tro alguna marca igual o similar a Ebel Paris que genere tal probabilidad de confusión. Las partes tampoco lo han planteado. Claramente, el oficial examinador intentaba en-fatizar la necesidad de evitar el engaño a los consumidores, pero el inciso (7) del Art. 5(a) de la Ley de Marcas, ante, abarca dicho tema en el contexto de una solicitud de regis-tro de una marca que es idéntica a otra marca ya inscrita.
Ello no obstante, tal disposición no aplica a la controver-sia que aquí nos concierne, a saber, si la marca Ebel Paris es “primarily geographically deceptively misdescriptive”, término que, cabe destacar, no es equivalente al de una marca geográficamente engañosa, regulada por la Sec. 2(a) del Lanham Act, ante. , \
Lo anteriormente expresado nos lleva a considerar las disposiciones de la Ley de Marcas que inciden sobre el asunto que hoy resolvemos. El Art. 5(a)(4) de la Ley de Marcas, 10 L.P.R.A. sec. 171c(4), establece que no se regis-trará ninguna marca que consista en palabras descriptivas de los productos que representa. A su vez, el inciso (a)(5) del referido artículo prohíbe el registro de palabras que indican el género, especie, naturaleza, calidad o forma de los productos. Por último, el inciso (a)(6) proscribe el regis-tro de una marca que contenga nombres o términos geográ-ficos que indiquen la procedencia o el origen de los produc-tos que representa.
No obstante lo anterior, el inciso (b) del Art. 5 dispone que las marcas mencionadas en los incisos (4) al (6) antes citados podrán ser inscritas cuando han adquirido “para los productos o servicios para los cuales se solicite el regis-tro, un carácter distintivo como consecuencia del uso que se ha hecho de la[s] misma[s]” en el mercado. 10 L.P.R.A. sec. 171c(b). Dicha disposición es equivalente a la exigen-cia federal de un significado secundario o “secondary meaning” habilitado por la Sec. 2(f) del Lanham Act, ante.
Claramente, los incisos (a)(4) y (a)(6) del Art. 5 proscri-ben el registro de una marca descriptiva así como aquella *639 indicativa del lugar de origen de los productos, salvo cuando éstas han adquirido un carácter distintivo o signi-ficado secundario en el mercado.
Aún bajo el supuesto que la marca Ebel Paris sea cata-logada como geográficamente descriptiva —ya sea al am-paro del Art. 5(a)(4), (a)(6) o la Sec. 2(e)(2) del Lanham Act, por ser indicativa del lugar de origen de los productos— según planteó la FIP en su oposición al registro de la marca, ésta ciertamente sería registrable en tanto ha ad-quirido. un “carácter distintivo como consecuencia del uso que se ha hecho de la misma”, conforme dispone el Art. 5(b) de la Ley de Marcas, ante, así como su contraparte federal, la Sec. 2(f) del Lanham Act, ante. En la página de Internet de Ebel (www.ebelparis.com), aparece la palabra Ebel en letras grandes y la palabra Paris debajo de ésta, en letras más pequeñas, igual que la marca propuesta. Surge que los productos son vendidos en Estados Unidos, Francia, Ar-' gentina, Bolivia, Chile, Colombia, Costa Rica, Ecuador, El Salvador, Guatemala, Méjico, Perú, Puerto Rico, República Dominicana y Venezuela. No existe duda de que la marca ha sido utilizada de forma continua en Estados Unidos. Actualmente, los productos Ebel Paris son mercadeados y vendidos en Puerto Rico y demás países antes mencionados.
Por su parte, el testigo Acevedo Villalba declaró que la compañía filial en Puerto Rico, Ventura Corporation, fue creada por Ebel International y ha trabajado con la marca Ebel Paris por cinco años en nuestro país con resultados exitosos. Igualmente indicó que las ventas de Ebel International ascienden los $700 millones de dólares anual-mente a nivel mundial, de los cuales el mercado puertorri-queño genera alrededor de $50 millones anuales.
Por otro lado, al evaluar la naturaleza de la marca Ebel Paris, es evidente que el término Ebel por sí solo cierta-mente constituiría una marca imaginable, ya que se trata de una palabra creada con el único propósito de represen- *640 tar los productos en cuestión. Las marcas arbitrarias o imaginables, conocidas en lo federal como “arbitrary” o “fanciful”, respectivamente, han sido catalogadas como “inherently distinctive”. Ello en vista que una marca imaginable fue creada con el único propósito de servir como marca. Consecuentemente, distinto a lo que ocurre con las marcas descriptivas, para su inscripción no se requiere que el solicitante demuestre un significado secundario. Véase McCarthy Secs. 11:1 — 11:2 y 11:4 — 11:8.
Sin embargo, no existe controversia en torno a que Ebel Paris es una marca compuesta. Una marca compuesta es aquella que combina palabras que pueden ser utilizadas de forma independiente. En aras de determinar si el significado primario de una marca compuesta es una localización geográfica, ésta debe ser evaluada en su totalidad. In re Save Venice New York, Inc., 259 F.3d 1346 (Fed. Cir. 2001). Véase, además, McCarthy Sec. 14:11. Según bien señaló el Tribunal de Apelaciones para el Noveno Circuito, citando a McCarthy Sec. 14:6, “a composite geographical mark should not be dissected into its parts to determine whether it is primarily geographical or not. It is the likely reaction of customers to the total mark that is at issue”. California Cooler v. Loretto Winery, Ltd., 774 F.2d 1451, 1455 (9no Cir. 1985). Así, pues, no podemos analizar la marca Ebel Paris de forma fragmentada.
Ahora bien, la inclusión de un término geográfico no impide que la marca sea registrable. McCarthy Secs. 11:59 y 14:1. Por una parte, aunque sea geográficamente descriptiva, puede registrarse si posee un significado secundario o una vez se demuestre que ha adquirido un significado secundario. Del mismo modo, si el uso del término geográfico es arbitrario, en tanto su inclusión en la marca no lleva a los consumidores a creer que tal lugar es el origen de los productos ni describe sus cualidades, es innecesario demostrar un significado secundario porque *641 posee el “inherent distinctiveness” que cobija a las marcas arbitrarias.
El Tribunal de Apelaciones Federal para el Segundo Cir-cuito ha destacado que “[t]he fact that a composite phrase contains a geographical term does not necessarily mean that the phrase, viewed as a whole, is a geographic designation. The question is whether the phrase can be construed to mean that the product is made in a certain locale”. (Enfasis suplido.) Forschner Group Inc. v. Arrow Trading Co. Inc., ante, pág. 355.
Una marca compuesta que contiene un término inhe-rentemente distintivo —en este caso uno imaginable— y uno que no es distintivo, geográfico, podría, al evaluarse en su totalidad, tornarse en distintivo (“acquired distinctiveness”) a causa de la combinación de ambos términos. McCarthy Sec. 15:67. Ahora bien, el solicitante debe re-nunciar (“disclaim”) al uso del término que, de ser utilizado por sí solo, no sería inscribible. McCarthy Sec. 19:63.
Sin embargo, adviértase que cuando la denegatoria de la inscripción de una marca compuesta se basa en que ésta es geográficamente engañosa al amparo de la See. 2(a) del Lanham Act o “primarily geographically deceptively misdescriptive” al amparo de la Sec. 2(e)(3), tal defecto no puede subsanarse mediante un “disclaimer” o renuncia a la exclusividad sobre el término geográfico, ya que la marca resulta engañosa de su faz McCarthy Secs. 14:31 y 19:64, citando a In re Wada, ante.
En resumen, un término geográfico es registrable cuando se utiliza como una marca arbitraria y no existe un “goods/place association” en la mente del consumidor entre el producto y el lugar mencionado. Igualmente, si el elemento geográfico de una marca coincide con el lugar de procedencia de los productos, no cabe hablar de que la marca es engañosa. No obstante, cuando la localización geográfica utilizada en la marca es reconocida por la producción de productos iguales o similares a los que repre- *642 senta la marca, y ese no es el origen de los productos en cuestión, la marca indudablemente es engañosa porque el consumidor adquirirá los productos bajo la creencia falsa de que provienen del lugar señalado en la marca.
IV
En vista de todo lo anterior, nos corresponde evaluar la marca Ebel Paris a la luz del examen establecido en In re California Innovations, Inc., ante, para determinar si es una marca “primarily geographically deceptively misdescriptive”. Según señalamos anteriormente, el primer paso requiere evaluar si el significado primario de la marca en cuestión es una localización geográfica conocida.
Indudablemente, París no es una localización oscura o desconocida, sino por el contrario, es una ciudad de renom-bre a nivel mundial. En particular, es reconocida, entre otras cosas, por ser el lugar de origen de productos de be-lleza de gran fama y calidad. Sin embargo, el significado primario de la marca Ebel Paris no es geográfico. Nos explicamos.
Según bien señala Ebel International, de eliminarse la palabra Paris, la marca retendría su significado primario: Ebel. No obstante, tomando en cuenta que se trata de una marca compuesta, debemos evaluar el significado primario de Ebel Paris en su totalidad. En primer término, al obser-var la marca propuesta, el consumidor contempla que la palabra Ebel resalta a la vista en letras grandes y mayúsculas. Por el contrario, la palabra Paris se ubica de-bajo de la palabra Ebel, en letras más pequeñas y de menor grosor.
Ebel International destaca, acertadamente, que el pro-pósito principal de una marca es identificar un producto particular y su fuente, diferenciándolo de otros productos en el mercado. Es evidente que los consumidores compran los productos de Ebel Paris por la marca en su totalidad y *643 no meramente porque incluye la palabra Paris. Como con-secuencia, resulta claro que el significado primario de la marca es la fama y calidad de los productos Ebel Paris. La marca Ebel Paris se diferencia de marcas cuyo registro ha sido denegado, tales como “The Venice Collection” y “New York Ways Gallery”, en tanto el significado primario de éstas era una localización geográfica conocida y sus pro-ductos no provenían de dicho lugar. Véanse: In re Save Venice New York, Inc., ante; In re Wada, ante.
Del testimonio de Acevedo Villalba surge que la inclu-sión de la palabra Paris respondió a motivaciones relacio-nadas al mercadeo del producto. Así, pues, aunque la pala-bra Paris tenía el propósito de realzar la calidad de los productos, descansando en la reputación internacional que posee dicha ciudad en la manufactura de productos de be-lleza, los productos efectivamente son manufacturados en Francia.
Ha sido reconocido que algunas localizaciones geográficas son utilizadas como marcas por motivo de su renombre o fama, lo cual a su vez realza la calidad de sus productos. McCarthy, Sec. 14:36. Indudablemente, París es una ciudad conocida mundialmente como el lugar de origen de numerosos productos de belleza de la más alta calidad y reputación. La inclusión del término Paris en una marca de productos de belleza ciertamente alude a la fama de dicha ciudad y podría llevar a un consumidor a adquirir el producto por tal motivo. Sin embargo, cuando existe una conexión entre los productos y la localización geográfica en cuestión, no se genera tal probabilidad de engaño. Consideramos que los productos Ebel Paris y Ebel International tienen vínculos suficientes con la ciudad de París. Veamos.
Acevedo Villalba declaró que es gerente corporativo de marcas y proyectos internacionales de Belcorp, corporación organizada bajo las leyes del Perú. Al expandir sus nego-cios internacionalmente, desarrollaron Ebel International, compañía que denominó como “matriz” con sede legal en *644 Bermuda, por razón de los incentivos tributarios y su loca-lización geográfica de acceso fácil a nivel internacional. Al definir las funciones de cada ente corporativo, indicó que Belcorp es la encargada de la orientación estratégica para el lanzamiento de los productos, la publicidad, la plata-forma de acceso a los mercados nuevos y las políticas de venta. Adviértase que ninguna de estas funciones incide directamente sobre la manufactura y control de calidad de los productos Ebel Paris, sino se enfocan en la imagen del producto ya terminado y los pasos a seguirse para introdu-cirlo a los diversos mercados.
Acevedo Villalba indicó además que Belcorp trasmite toda esa información a las compañías filiales, ubicadas en distintas regiones del mundo, incluyendo Puerto Rico. Aclaró que Ebel International es la dueña de las compa-ñías filiales y tenedora (holding company) de los productos de belleza y cuidado personal.
Por otra parte, indicó que Ebel France, compañía filial de Ebel International y constituida al amparo de las leyes de Francia, es la responsable de supervisar a los terceros que investigan, manufacturan y maquilan los productos Ebel Paris. Así, Ebel France es la que controla los abaste-cimientos, la logística, la operación de desarrollo, produc-ción y control de calidad de los productos, que luego son enviados desde Francia hacia América Latina. Asimismo, explicó que el desarrollo, la fabricación, el proceso de ma-quilar y la mezcla de los ingredientes se lleva a cabo entre Ebel France y varios fabricantes y proveedores, todos ubi-cados en Francia, y luego los productos son envasados en Colombia,(7) país desde el cual se distribuyen a doce países. Sobre el particular, señaló que toda la investigación y ma-nufactura de la esencia de sus productos es llevada a cabo por MF Productions, ubicada en Francia, y en el Centro de *645 Biodermatologie des Laboratoires Sérobiologiques, locali-zado a 400 km de la ciudad de París.
De los contratos que obran en el expediente y del testi-monio de Acevedo Villalba surge que Ebel France contrata a terceros —compañías francesas— para la producción de bulk,(8) empaque y embalaje de la fórmula abastecida por Ebel International. En dichos contratos, las partes acorda-ron que Ebel France era “una empresa dedicada a la repre-sentación comercial e intermediación para operaciones de compra y venta en nombre de terceros, así como para la compra y venta por cuenta propia de todo producto para el cuidado del cuerpo, perfumería, cosméticos, productos para el cuidado del cabello, artículos ópticos, estéticos y todos aquellos productos o accesorios de lujo, incluyendo los en-vases y artículos de embalaje que se relacionen con estos productos”. Apéndice, pág. 60.
Acevedo Villalba también señaló que, para determinar el origen de un producto, la Organización Mundial de Co-mercio exige que el 60% de los componentes provengan del país que alegan como origen y que el último proceso de transformación importante sea hecho en dicho país. Sobre ello, indica que más del 80% de los componentes de los productos Ebel Paris se originan en Francia y el último proceso de transformación es el de maquilar, también lle-vado a cabo en Francia.
Por último, indicó que la procedencia de los productos Ebel Paris también es confirmada por la aprobación del Food and Drug Administration (FDA), agencia federal que impone requisitos estrictos para demostrar el lugar de ori-gen de los productos Ebel Paris —los cuales constan como “Made in France”— antes de permitirle acceso al mercado estadounidense. Acevedo Villalba explicó que su cumpli-miento con la designación del origen de los productos tam- *646 bién se refleja en el uso de la marca Ebel por sí sola cuando se trata de productos fabricados en Chile, Colombia o Perú.
Surge del expediente que el único testigo fue Acevedo Villalba. La FIP no presentó prueba testifical.
La FIP no rebatió la aseveración de Acevedo Villalba en torno a que la esencia de los productos Ebel Paris son ma-nufacturados en el Centre de Biodermatologie des Labora-toires Sérobiologiques, centro de investigación y desarrollo de fórmulas de cosméticos ubicado en Francia, y que los encargados de la producción y maquilación de los produc-tos son compañías francesas. Por el contrario, admitió que no existía controversia sobre ello.
La prueba presentada por la FIP ante el Departamento de Estado incluyó los contratos suscritos entre Ebel France y las compañías francesas antes reseñadas, así como va-rias resoluciones procedentes de diversos países en las que se deniegan las solicitudes de registro de ciertas marcas. Sin embargo, ninguna de las resoluciones antes menciona-das trataba sobre la denegatoria del registro de la marca Ebel Paris en los países en cuestión. Además, lo resuelto en otros países no nos vincula, máxime tomando en cuenta que existen diferencias sustantivas en lo relativo a las le-yes aplicables. Por el contrario, nuestro derecho sobre mar-cas está íntimamente ligado a la legislación y jurispruden-cia federal sobre dicho tema, la cual resulta altamente persuasiva ante la escasez de nuestra jurisprudencia al respecto.
El único argumento de la FIP es que aun cuando los productos Ebel Paris son manufacturados en Francia, no se manufacturan en Paris per se. Además, señala que Ebel France es una subsidiaria de Ebel International, la cual a su vez es la tenedora de las marcas de Belcorp, por lo cual, los productos Ebel Paris le pertenecen a una corporación peruana. Tal argumento ignora que es Ebel France la res-ponsable de todo lo relativo a la manufactura de los pro-ductos Ebel París, particularmente del control de calidad de éstos, la contratación de terceros encargados de crear *647 las fórmulas, mezclar los ingredientes y asegurar que el producto terminado sea de la más alta calidad. Tales fun-ciones no las ejerce Belcorp ni Ebel International.
En vista de que la FIP admitió que no existe controver-sia en torno a que el producto se fabrica en Francia, y tomando en cuenta que Ebel France, ente que maneja todo lo relativo a los productos Ebel Paris, está ubicado en París, existen conexiones suficientes con dicha ciudad. El hecho de que se trata de una compañía subsidiaria no al-tera su rol primario en la fabricación de los productos Ebel Paris, máxime cuando Ebel International es la dueña de dicha corporación y le ha conferido tales facultades de forma exclusiva a Ebel France.
En ocasiones anteriores, hemos destacado que el testimonio de un solo testigo sobre un hecho, que le merezca entero crédito al tribunal, es suficiente para que dicho hecho quede establecido. Regla 10(d) de Evidencia, 32 L.P.R.A. Ap. IV. Véase, además, Santiago Otero v. Méndez, 135 D.P.R. 540 (1994). Igualmente, aunque en asuntos de credibilidad de la prueba concedemos, de ordinario, gran deferencia a las determinaciones de hechos efectuadas por los foros recurridos, cuando a nuestro entender, sus determinaciones no constituyen el balance más racional, justiciero y jurídico de la totalidad de la prueba presentada en el caso, es nuestro deber rechazar dicha interpretación errada, situación a la que nos enfrentamos hoy. Véanse: Trinidad v. Chade, 153 D.P.R. 280 (2001); Santiago Otero v. Méndez, ante.
Por otro lado, no hay duda de que es norma reiterada en nuestro ordenamiento que las decisiones de las agencias administrativas —en vista de su conocimiento especializado y experiencia en la materia— tienen a su favor una presunción de regularidad y corrección que debe ser respetada. La Ley de Procedimiento Administrativo Uniforme (L.P.A.U.) dispone que “[l]as determinaciones de hechos de las decisiones de las agencias serán sostenidas por *648 el tribunal, si se basan en evidencia sustancial que obra en el expediente administrativo”. See. 4.5 (3 L.P.R.A. sec. 2175). Evidencia sustancial es aquella evidencia relevante que una mente razonable podría aceptar como adecuada para sostener una conclusión.
Como corolario de lo anterior, de ordinario, nuestra intervención debe limitarse a determinar si la agencia actuó arbitraria o ilegalmente, o de manera tan irrazonable que su actuación constituyó un abuso de discreción. Camacho Torres v. AAFET, 168 D.P.R. 66 (2006); Otero v. Toyota, 163 D.P.R. 716 (2005). Por el contrario, “las conclusiones de derecho serán revisables en todos sus aspectos por el tribunal”. See. 4.5 de la L.P.A.U., ante.
No obstante lo antes expresado, estamos convencidos de que, en el caso de autos, el Departamento de Estado erró en su interpretación del derecho aplicable. Por un lado, recurrió al Art. 5(a)(7) de la Ley de Marcas, ante, cuando no se presentó ante su consideración una controversia so-bre marcas idénticas o similares, conflictivas entre sí. Dicha decisión errónea se fundamenta en el informe del ofi-,cial examinador. Éste, en todo momento, indicó que la controversia a resolverse era si la marca Ebel Paris era geográficamente engañosa, cuando la realidad es que el asunto por resolverse era si la marca Ebel Paris era “primarily geographically deceptively misdescriptive”. No aplicó correctamente la normativa aplicable al analizar si una marca es “primarily geographically deceptively misdescriptive”.
Concluimos que el Departamento de Estado actuó de forma arbitraria e irrazonable al evaluar la prueba desfi-lada y efectuar conclusiones de derecho que distan de ser correctas. Tomando en cuenta todo lo antes expuesto y con-forme con lo resuelto en Posadas de P.R. v. Sands Hotel, ante, resulta claro —y así lo resolvemos— que la marca Ebel Paris no es una marca “primarily geographically deceptively misdescriptive”.
*649 V
En mérito de lo antes expuesto, procede dictar sentencia revocatoria de la emitida por el Tribunal de Apelaciones y ordenar el registro de la marca Ebel Paris en el Registro de Marcas del Departamento de Estado de Puerto Rico.

Se dictará sentencia de conformidad.

El Juez Asociado Señor Fuster Berlingeri no intervino.

 La Federation des Industries de la Perfumerie (FIP) es una federación orga-nizada al amparo de las leyes de Francia. Sus miembros son asociaciones de empre-sas francesas dedicadas a la manufactura y venta de productos de perfumería, de belleza y de cosméticos, para el cuidado del cuerpo y otros de índole similar.

 Los tribunales federales también han identificado categorías de marcas igua-les a las antes reseñadas. Véanse: Leelanau Wine Cellars, Ltd. v. Black & Red, Inc., 502 F.3d 504 (6to Cir. 2007); Jewish Shepardic Yellow Pages, Ltd. v. DAG Media, 478 F. Supp.2d 340 (E.D. N.Y. 2007).

 Para facilitar la discusión, utilizaremos el término en inglés, ya que la tra-ducción no retiene el significado que le otorga el Lanham Act y la jurisprudencia interpretativa.

 La Corte de Apelaciones para el Circuito Federal (United States Court of Appeals for the Federal Circuit) fue creada al amparo del Art. Ill de la Constitución de Estados Unidos de América. Tiene jurisdicción, entre otros, sobre los casos de marcas y las revisiones administrativas provenientes del Trademark Trial and Appeals Board (TTAB), foro ante el cual la parte afectada adversamente recurre de las determinaciones del Patent and Trademark Office (P.T.O.).

 Para ello, han exigido la presentación de prueba sobre ciertos elementos, tales como si la marca ha sido utilizada en el mercado por un periodo de tiempo sustancial, los gastos en que se incurrió en la publicidad y el mercadeo de la marca, el volumen de ventas, la existencia de una asociación entre la marca y el origen del producto en la mente de los consumidores, así como “unsolicited media coverage of the product”, “attempts to plagiarize the mark” y “the exclusivity of the mark’s use”. Leelanau Wine Cellars v. Black & Red, Inc., ante; Daesang Corp. v. Rhee Bros, Inc., 2005 U.S.Dist. LEXIS 9066; 77 U.S.P.Q.2d (BNA) 1753 (D. MD. 2005); Jefferson Bankshares v. Jefferson Savings Bank, 1989 U.S. Dist. LEXIS 16165; 14 U.S.P.Q.2d (BNA) 1443 (W.D. VA. 1989); Burke-Parsons-Bowlby v. Appalachian Log Homes, 871 F.2d 590 (6to Cir. 1989).

 Según la Real Academia Española, maquilar se define como importar mate-rias primas, tratarlas y exportarlas. El gerente de marcas y proyectos internaciona-les de Belcorp indicó que maquila es cuando una planta fabrica para un tercero.

 Previo al 1 de enero de 2005, los productos también eran envasados en Fran-cia, pero debido al alto costo de la mano de obra, dichas labores ahora se llevan a cabo en Colombia.

 Es el resultado de la mezcla de los ingredientes para crear la fórmula del producto.